**SAFFARI LAW GROUP**
NINAZ SAFFARI (SBN # 235811)
8383 Wilshire Blvd., Suite 830
Beverly Hills, CA 90211
Telephone: (310) 592-0247
Facsimile: (213) 402-2953
Email: ninaz@saffarilaw.com

Attorneys for Defendant
SHUKIMBA MALIK CARLIS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHUKIMBA MALIK CARLIS,<br><br>Defendants. | Case No.: 2:25-cr-00249-MWC-2<br>Assigned to: Hon. Michelle Williams Court<br>Dept.: 6A<br><br>**DEFENDANT SHUKIMBA MALIK CARLIS' SENTENCING MEMORANDUM**<br><br>Hearing: November 20, 2026<br>Time: 10:00 a.m.<br>Dept.: 6A |

TO: TODD BLANCHE, ACTING ATTORNEY GENERAL; BILAL A. ESSAYLI, FIRST ASSISTANT UNITED STATES ATTORNEY; JENNIFER L. WAIER, CHIEF ASSISTANT UNITED STATES ATTORNEY; AND THI HOANG HO, ASSISTANT UNITED STATES ATTORNEY of the UNITED STATES ATTORNEY'S OFFICE; and THE CLERK OF THE COURT for the CENTRAL DISTRICT OF CALIFORNIA:

Defendant Shukimba Malik Carlis, through her counsel of record, hereby files her Sentencing Memorandum pursuant to 18 U.S.C. § 3553(a). Specifically, she respectfully requests that the Court impose a sentence of twelve months of home detention as a condition of probation. That sentence is sufficient, but not greater than necessary, considering her individual circumstances; the Government's overstatement in the loss calculation underlying the advisory guideline range; and the November 1, 2026 Sentencing Guidelines amendment that now lowers the offense level of each category of

losses to account for inflation.

This Sentencing Memorandum is based upon the included memorandum of points and authorities and exhibits attached hereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 6, 2026

Respectfully submitted,

**SAFFARI LAW GROUP, P.C.**

Ninaz Saffari, Esq.
Attorneys for Defendant
SHUKIMBA MALIK CARLIS

///

**SENTENCING MEMORANDUM**

## I.

## INTRODUCTION

Defendant Shukimba Malik Carlis ("Ms. Carlis"), age 52, violated federal law by committing wire fraud. At an early stage in these proceedings, she accepted responsibility therefor and entered a guilty plea pursuant to the "Plea Agreement for Defendant Shukimba Malik Carlis" (the "Plea Agreement"). *See* Dkt. no. 39.

Ms. Carlis recognizes that she is facing significant custody time and is determined to live a full, productive, and law-abiding life hereafter. She understands the devastating nature of the terrible decisions she made that brought her to this point and simply requests that the Court consider a downward departure based on the factors set forth below.

More specifically, the Government seeks a significant term in federal prison of **18 months**[1] (followed by supervised release for a term of 3 years) that is based largely on the allegation that Ms. Carlis and her co-defendant Sofia Vanessa Herrera ("Ms. Herrera") are each jointly and severally culpable for the entire alleged loss of $272,481.91 incurred from the illegal use of two credit cards from their union/employer. However, only $47,292.24 can be directly attributed to Ms. Carlis, of which $12,293.87 were found by a forensic accountant to be legitimate union-related expenditures.

Accordingly, a sentence of 12 months of home detention as a condition of probation would impose meaningful punishment, restrict Ms. Carlis' liberty, deter future misconduct, permit continued restitution and employment, and protect the public. Conversely, a custodial sentence would be greater than necessary to accomplish the statutory purposes of sentencing.

## II.

## FACTUAL AND PROCEDURAL CHRONOLOGY

From October 2020 until September 2022, Ms. Carlis served as President of American Federation of State, County, and Municipal Employees ("AFSCME") Local

[1] As recommended in the June 11, 2026 Sentencing Recommendation from the United States Probation & Pretrial Services Office, U.S. Probation Officer Jacqueline Lira. *See* Dkt. no. 43 (June 18, 2026 Disclosed Recommendation Letter ["Sentencing Recommendation"]).

Chapter 2620 ("Local 2620"), a labor union representing approximately 5,000 health and social services professionals employed by the State of California. *See* Presentence Investigation Report regarding Ms. Carlis ("PSR"), Dkt. no. 44, ¶¶ 18, 19.

In March 2021, Ms. Carlis appointed Ms. Herrera as Treasurer of Local 2620, a position she, too, held until September 2022. PSR ¶ 20.

As part of their roles, Ms. Carlis and Ms. Herrera each used a union-issued Mastercard credit card in their own name, intended for use in connection with union business. Ms. Carlis' card ended in 8607 and Ms. Herrera's in 8979. PSR ¶ 21.

According to the PSR, beginning no later than March 2021 and continuing through September 2022, in Los Angeles County and elsewhere, Ms. Carlis and Ms. Herrera knowingly and with intent to defraud, devised, participated in, and executed a scheme and artifice to obtain money and property from AFSCME and Local 2620 by means of materially false and fraudulent pretenses, representations, and the omission and concealment of material facts. PSR ¶ 28.

According to the PSR, in executing the fraudulent scheme, Ms. Carlis and Ms. Herrera caused Local 2620 to lose $272,481.91. Of this total, $47,292.24 was charged to AFSCME Credit Card 8607 (Ms. Carlis' credit card), and $225,189.67 was charged to AFSCME Credit Card 8979 (Ms. Herrera's credit card). PSR ¶ 38. "While Carlis held a higher position within the organization, ***Herrera … benefited <u>more</u> based upon the accumulation of more non-AFSCME-related expenses on her AFSCME credit card***." PSR ¶ 59. That even the USAO agrees that Ms. Herrera bears the brunt of criminal culpability is evidenced by the fact that two-thirds of the counts in the indictment are charged against her alone.

According to the PSR, they used the two credit cards interchangeably, and both cards' bills were paid from a single Local 2620 checking account. PSR ¶ 21, fn. 3. However, as discussed below, Ms. Carlis respectfully disputes this assertion, which is neither supported by substantial evidence nor even memorialized in the defendants' Plea Agreements (see below). In fact, the only purported evidence supporting this allegation came from Ms. Herrera herself during her pre-indictment interview. Specifically, she knew she was responsible for approximately 83% of all the charges at issue and, therefore, made this self-serving claim to equally implicate Ms. Carlis in an obvious attempt to avoid more

severe consequences. Thus, to effectively assume that Ms. Carlis' Base Offense Level should be raised by 10 is unjust.

Indeed, even U.S. Probation Officer Jacqueline Lira wrote that since **82.64%** of the total $272,481.91 ($225,189.67) in charges were incurred on Ms. Herrera's credit card, and because she was the union treasurer who therefore had more opportunity to use said card than Ms. Carlis did hers (and who held a greater fiduciary duty to the union than Ms. Carlis), Ms. Herrera was responsible for the majority loss. PSR ¶ 59.

Personal charges on the cards were prohibited by AFSCME's Financial Standards Code and Local 2620's written credit card policy. PSR ¶ 23. Notwithstanding, Ms. Carlis and Ms. Herrera used the AFSCME credit cards to make purchases for non-AFSCME-related expenses and for their personal benefit. PSR ¶ 29(a). The credit card bills were then paid using Local 2620's funds. PSR ¶ 29(c).

According to the PSR, "Herrera, with Carlis' help, did not inform Local 2620's executive board or Local 2620's trustees about their misuse of the AFSCME Credit Cards and Local 2620 funds and repeatedly failed to provide related financial records to Local 2620's executive board and Local 2620's trustees." PSR ¶ 30.

In October 2022, the union's judicial panel removed Ms. Carlis from office and subsequently determined that both she and Ms. Herrera had violated the AFSCME constitution and therefore suspended them from the union. PSR ¶ 37.

On November 15, 2022 (almost two-and-a-half years before she was indicted), Ms. Carlis' former attorney, Russell J. Cole, submitted a letter to the Union, which documents that she was already providing transparency, cooperating with an audit, and answering financial questions. **Defense Exhibit E**.

In May 2023, the union judicial panel found both Carlis and Herrera guilty of violating the AFSCME constitution and suspended them from the union. PSR ¶ 37.

On April 4, 2025, the Government indicted Ms. Carlis and Ms. Herrera on six counts of Wire Fraud (18 U.S.C. § 1343) with Ms. Carlis only named in Counts 1 and 2. *See* Dkt. no. 1, 6:3-11. The *gravamen* therein charges that, beginning no later than March 2021 and continuing through September 2022, the defendants knowingly and with intent to defraud, devised, participated in, and executed a scheme and artifice to obtain money and property from the AFSCME and Local 2620 by means of materially false and

fraudulent pretenses, representations, and the omission and concealment of material facts, in violation of 18 U.S.C. § 1343.

On June 5, 2025, Ms. Carlis appeared pursuant to the Summons and was released on a $20,000 unsecured appearance bond with certain conditions (Dkt. no. 18), including that she submit to Pretrial Services Agency (PSA) supervision, that she does not sell, transfer, or give away any asset valued at $10,000 or more without notifying and obtaining permission from the Court except attorney fees, and that she not maintain or obtain an executive board position of any trade union. She has successfully honored all those terms: "PSA records indicate that **Carlis has complied with all Court-ordered conditions of release**." PSR ¶¶ 14-15.

On April 10, 2026, Ms. Carlis pled guilty to Count Two, which charges that on March 31, 2022, she committed wire fraud, in violation of 18 U.S.C. § 1343. In consideration thereof, the Government dismissed with prejudice Count 1, charging a violation of 18 U.S.C. § 1343: Wire Fraud, and, provided she demonstrates an acceptance of responsibility, up to and including the time of sentencing, to recommend a two-level reduction under U.S.S.G. § 3E1.1 and, if necessary, an additional one-level reduction. PSR ¶¶ 1, 11; *see* Dkt. no. 39 ("Plea Agreement for Defendant Shukimba Malik Carlis" ["Plea Agreement"]), ¶¶ 2(a), 3 (c), (d).

On May 29, 2026, U.S. Probation Officer Jacqueline Lira interviewed Ms. Carlis, with counsel present, via videoconference. Ms. Carlis adopted the factual basis in the Plea Agreement as her statement for acceptance of responsibility. PSR ¶ 43.

In the written Plea Agreement, Ms. Carlis and the Government stipulated to a factual basis and agreed that the offense carries a base offense level of seven pursuant to U.S.S.G. § 2B1.1(a)(1). Plea Agreement ¶ 11. The parties expressly reserved the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate, including under U.S.S.G. § 2B1.1(b)(1)(G) and U.S.S.G. § 3B1.3. *Id.*

The parties also agreed to a limited mutual waiver of appeal tied to a restitution figure of $272,481.91, the very figure this memorandum shows to be substantially overstated. Plea Agreement *Id.* ¶ 16.

On June 18, 2026, the Probation Office issued its Sentencing Recommendation. *See*

Dkt. no. 43.

On June 18, 2026, the Government completed its PSR.

On July 10, 2026, the Government filed its Sentencing Position regarding Ms. Herrera. *See* Dkt. no. 49.

On September 19, 2026, Ms. Herrera filed her Sentencing Memorandum. *See* Dkt. no. 57.

On September 21, 2026, the Government filed its Supplemental Sentencing Position regarding Ms. Herrera. *See* Dkt. no. 58.

On September 26, 2026, Ms. Carlis submitted her "Personal Statement of Acceptance, Reflection, and Remorse", which was included as part of the Government's Presentence Probation Packet:

> I understand the seriousness of my actions and the impact they had on the members of the Union. … I accept full responsibility for my actions. … I have carried a tremendous amount of shame, guilt, hurt, and embarrassment. I may also lose a career that I absolutely love. My work has always centered on helping, supporting, and advocating for people who are vulnerable, disenfranchised, judged by society, or simply need someone who will listen to them without judgment. Regardless of what happens, I understand that my own decisions placed me in this position. …
>
> I am deeply sorry for the harm my actions caused. I am committed to making restitution and to continuing to demonstrate through my actions that I have learned from this experience. I cannot undo what happened, but I can make sure that the lessons from it affect how I live, work, and make decisions for the rest of my life. …
>
> I respectfully ask the Court to see me as a whole person -- not just through the worst decisions I have made, but also through the life I have lived, the people I have helped, the family that depends on me, and the person I am working every day to become.

**Defense Exhibit F**.

## III.

## THE PRESENTENCE INVESTIGATION REPORT AND GOVERNMENT'S CALCULATION OF RECOMMENDED SENTENCE

The PSR asserts a base-level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1). PSR ¶ 48. The PSR applies a 12-level increase under U.S.S.G. § 2B1.1(b)(1)(G) based on an

"actual" loss of $272,481.91. PSR ¶¶ 50, 51. The Government adopted that same figure, explaining that it is based on "an audit, conducted by the U.S. Department of Labor, Office of Inspector General ('DOL-OIG'), of defendant and her co-defendant's credit card transactions and other charged expenses." *See* Dkt. no. 49 (Government's Sentencing Position regarding Ms. Herrera), 5:23-6:5.

The Government's own exhibit identifies the subject credit card charges as amounting to $225,189.67 on Ms. Herrera's card and only $47,292.24 on Ms. Carlis' card (or a grand total of $272,481.91). Those figures amount to $272,481.91. The calculation therefore includes *every* charge posted to *both* cards that the Government claims was unrelated to union business, was made for the defendants' own personal benefit, and therefore was illegal. In doing so, the Government simply took the union's word as to which charges were union-related and which were not. However, when carefully going over each of these card charges, defendants' forensic accountant was able to determine that many of the allegedly non-union charges were, in fact, union related. Thus, by including legitimate charges with personal charges, the Government contravenes the policy behind the Sentencing Guidelines.

Under U.S.S.G. § 2B1.1 cmt. n.3(A), "actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense. A charge for union convention lodging, office equipment, or business supplies does not constitute pecuniary harm to the union simply because it appeared on a credit card statement. The relevant question is whether the expenditure was actually personal, unauthorized, *and* attributable to the charged scheme, not whether the transaction was *initially* flagged for investigative review.

The Government's exhibit does not answer that question. Its "Fraud or Legit?" column identifies the investigative source that flagged each transaction; **it does not establish that each transaction was personal *or* fraudulent**. The resulting total is thus a *gross*-expenditure figure, not a transaction-specific determination of loss.

Next, "[b]ased on the totality of circumstances, Carlis' role as President of AFSCME Local 2620 allowed her to commit the offense and prolong concealment of the offense. As such, pursuant to U.S.S.G. § 3B1.3, a two-level increase for abuse of position of public or private trust is applied." PSR ¶ 61.

In addition, "**Carlis has clearly demonstrated acceptance of responsibility for**

**the offense**. Accordingly, the offense level is decreased by two levels. U.S.S.G. § 3E1.1(a)." PSR ¶ 70. "**Carlis has [also] assisted authorities in the investigation or prosecution of her own misconduct** by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. U.S.S.G. § 3E1.1(b)." PSR ¶ 71.

Based on the foregoing, the Governments calculates the offense level as follows: base level of 7, plus a 10-level increase based on an "actual" loss of $272,481.91, plus a 2-level increase for abusing a position of trust = 19; then a downward departure of 3 for accepting responsibility and assisting in her own prosecution, plus a downward departure of 2 for being a Zero-Point Offender, for a Total Offense Level of **14**. PSR ¶ 74. Regarding the latter, Ms. Carlis has no significant prior criminal history (i.e., no felony or even misdemeanor convictions) and satisfies each of the criteria in U.S.S.G. § 4C1.1(a), thereby qualifying her for a two-level reduction as a Zero-Point Offender. PSR ¶ 80. "This report includes a two-level reduction for Zero-Point Offender pursuant to USSG §4C1.1 which is not contemplated in the Plea Agreement." PSR ¶ 80.

## IV.
## THE FORENSIC ACCOUNTING REPORT

Ms. Carlis respectfully disagrees with the Government's calculation of the Total Offense Level in its Sentencing Position regarding Ms. Herrera. (The Government has not yet filed their own Sentencing Position regarding Ms. Carlis; however, the Government applies the same calculation regarding Ms. Herrera to Ms. Carlis.) Ms. Carlis explicitly reserved the right to dispute this calculation in her Plea Agreement: "Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate, including under U.S.S.G. § 2B1.1(b)(1)(G)." *Id.* at ¶ 11.

In addition, "Defendant … reserve[s] the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7)." *Id.* at ¶ 13.

In preparation for sentencing, Ms. Carlis and Ms. Herrera retained the same forensic accountant to review, transaction by transaction, both AFSCME credit card

statements for the entire period at issue.[2] *See* **Defense Exhibits A** through **D**, attached hereto. That review classified every charge on both cards into one of three categories:

(1) "Union" (**Defense Exhibit B**), meaning the transaction is plainly related to legitimate union business, including luggage and travel expenses for officer trips to AFSCME conventions and staff trainings, hotel accommodations for the AFSCME conventions held in New York and Philadelphia, office supplies purchased from Staples and Office Depot, Apple computer equipment issued for use in the union office, conference signage, and catering;

(2) "Possible Union" (**Defense Exhibit C**), meaning the transaction is ambiguous and could plausibly reflect legitimate union business, including clothing purchases of the kind Ms. Herrera told investigators the union permitted officers to make in order to present themselves well while representing the union publicly (*see* Presentencing Report regarding Ms. Herrera, ¶ 45); and

(3) "Non-Union/Personal" (**Defense Exhibit D**), meaning the charge cannot reasonably be characterized as anything other than a personal expenditure.

That review found that of the $272,481.91 total charged on both cards during the relevant period (**Defense Exhibit A**), $69,561.85 -- more than 25% of the Government's entire loss figure, was classified as clearly "Union Related" and *not* for personal benefit: i.e., convention travel, hotel accommodations, office equipment, supplies, and similar expenses. **Defense Exhibit B**. An additional $56,083.49 falls into the ambiguous "Possible Union" category. **Defense Exhibit C**.

This legitimately reduces the alleged total loss to approximately $202,920.06, which is significantly below the $250,000 threshold for the 10-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G).

The review also found that of the $47,292.24 of the $272,481.91 sum that is directly attributed to Ms. Carlis' union credit card, $12,293.87 were legitimate union-related expenses, thereby reducing this directly attributable loss to $34,998.37 (a 26% reduction). In addition, of that sum, $5,080.52 was characterized as "possible union" which, if accepted by the Court, would thereby further reduce the directly attributable

[2] Kathy A. Johnson, CPA, MBA, ABV/CFF/CGMA, and Vice President of Forensic Accounting and Economics, J.S. Held LLC.

loss to **$29,917.85**.

The question is whether a sentencing range calculated from the gross amount of every charge on both cards accurately reflects the harm caused by Ms. Carlis' conduct and her individual culpability. Ms. Carlis respectfully contends that it does not.

**V.**

**THE GOVERNMENT'S SUPPLEMENTAL SENTENCING POSITION**

In its Supplemental Sentencing Position regarding Ms. Herrera (filed September 21, 2026; Dkt. no. 57), the Government requests that the Court completely disregard the forensic accountant's findings based on the fact that: (1) the Government believes some of the purportedly union-related expenses were clearly not union-related; (2) the union had never authorized these expenditures and defendants had never submitted these purchases for approval after the fact; (3) the union itself had previously found that these purportedly union-related expenses were also, in fact, not union-related; and (4) defendants had already been found to be "guilty" by the union.

First, many of the purported union-related charges upon which the Government bases its argument were, in fact, directly related to union business. Ms. Carlis will provide evidence thereof in her Supplemental Sentencing Memorandum (which will also address the Government's Position with Respect to Sentencing Factors, filed on November 6, 2026.

Second, the Government cannot merely rely on the union's findings that these purportedly union-related expenses were, in fact, not union-related and that defendants were "guilty" for the simple reason that two entirely disparate evidentiary thresholds are required in the union's findings and the present criminal action. Here, the Government must obviously present admissible evidence and, based thereon, prove defendants are guilty beyond a reasonable doubt. In the union's proceedings, however, there were no such legal and constitutional protections, and no discernible evidentiary threshold (though presumably it was a much lower standard akin to a preponderance of evidence as in civil matters).

Third, neither Ms. Carlis nor Ms. Herrera defend themselves in the union proceedings, which the Government notes, but they were not required as a matter of law (or even union policy) to do so. Indeed, doing so without the legal and constitutional

protections afforded them in the present criminal proceedings would have unnecessarily exposed them to criminal prosecution. In other words, simply because they chose not to appear and explain themselves before the union should have no bearing whatsoever in how the Court ultimately decides to sentence them.

## VI.

## THE EFFECT OF THE OVERSTATED LOSSES ON SENTENCING GUIDELINES

In addition to the foregoing, if the Court further credits the $56,083.49 in ambiguous "Possible Union" transactions, the loss falls to approximately $146,836.57, below the $150,000 threshold for an 8-level enhancement. *See* Plea Agreement ¶ 11 (reserving both parties' right to argue additional specific offense characteristics).

The parties stipulated in the Plea Agreement that the base offense level for Ms. Caris' offense is 7, pursuant to U.S.S.G. § 2B1.1(a)(1). Plea Agreement ¶ 11.

## VII.

## MS. CARLIS' SOCIAL, CRIMINAL, AND MEDICAL HISTORY

As accurately stated in the June 11, 2026 Sentencing Recommendation:

> Carlis' history and characteristics are important factors for consideration. [She] was raised … in Oakland, California…. Her … home life was chaotic due to her parents' tumultuous relationship. Carlis' father struggled with a crack cocaine addiction, and he physically abused Carlis' mother. Carlis suspects she was **sexually abused by her maternal uncle at approximately age seven**. …
>
> Carlis' parents divorced when she was 15 years old, and she only saw her father "every once in a while" after their separation. Following the divorce, Carlis' mother entered into a series of abusive relationships which again exposed Carlis to domestic violence in the home. At age 16, Carlis lived with her mother's co-worker, and she lacked supervision….
>
> She graduated high school and pursued higher education. Carlis now has a master's degree in social work.[3] When Carlis was an adult, her father's longstanding substance abuse led to psychosis. Carlis' father was murdered in his home in 2003. … Carlis saw his body before law enforcement responded…. Carlis' mother completed nine months of

---

[3] "Carlis earned a master's degree in social work in approximately 2007 from California State University, East Bay. She earned a bachelor's degree in psychology from San Francisco State University in [2]001." PSR ¶ 117.

> hospice care in Carlis' home prior to her passing in 2023.
>
> [p. 7] Carlis is a licensed clinical social worker.[4] She is the owner of a therapeutic services business in Stockton, California, and works as an independent contractor in Sacramento, California. Carlis primarily provides sex offender treatment.
>
> Carlis has been diagnosed with **depression, anxiety, attention deficit hyperactivity disorder, and post-traumatic stress disorder** since her twenties. She is prescribed medication to manage these diagnoses.
>
> Carlis has never been married. She has three adult sons, ages 28, 22, and 22. **Two of her sons are diagnosed with bipolar disorder. Her son Andrew has the most severe mental health issues**. He has a history of law enforcement contact during manic episodes, and he has been subject to at least one involuntary psychiatric hold. **Andrew continues to live with Carlis and relies on her for care and support. Carlis fears being unable to provide for her son if sentenced to imprisonment**. …
>
> Carlis falls within criminal history category I. Her criminal history began in 2021, at age 47. She has a conviction for fraud-obtain[ed] aid for which she was sentenced to deferred judgement with a successful completion of drug court. …
>
> [I]n 2015, Carlis was subject to disciplinary action [only] by the California Board of Behavioral Sciences for the unlicensed practice of social work in 2011. …
>
> [p. 8] Carlis has been under pretrial supervision since June 5, 2025. PSA records indicate that Carlis has complied with all Court-ordered conditions of her release.

*Id*. at pp. 6-8 of 11 (emphasis added).

The PSR confirms *all* the foregoing, and adds the following:

> Carlis was diagnosed with diabetes over ten years ago and was diagnosed with high blood pressure in approximately 2016. … [¶ 108] From Carlis' twenties to present, she has experienced night terrors due

---

[4] "Carlis has specialized training in sex offender treatment, trauma treatment, dialectical behavior therapy, and cognitive behavioral therapy. … The California Board of Behavioral Sciences verifies that Carlis' license (license number 90527) as a licensed clinical social worker is renewed and current. This license expires on July 31, 2027." PSR ¶ 119. "From 2007 to 2014, Carlis worked as a Social Worker II for Child Protective Services." PSR ¶ 127.

> to a REM sleeping disorder. She was diagnosed in her thirties. … [¶ 113] Carlis is prescribed Adderall, Cymbalta, and Lamictal to manage her diagnoses….

PSR ¶¶ 107, 108, 113.

These medical conditions would likely be significantly exacerbated if Ms. Carlis was sentenced to actual imprisonment.

## VIII.

## THE COURT SHOULD REFLECT THE APPLICABLE DOWNWARD DEPARTURES

The United States Supreme Court has held that the United States Sentencing Guidelines (the "Sentencing Guidelines," "Guidelines," or "U.S.S.G.") are merely advisory and not determinative. *United States v. Booker*, 543 U.S. 220, 245 (2005) ("*Booker*"). Under Title 18, section 3553(a) of the United States Code ("U.S.C."), the Guidelines serve as only one factor among several that courts consider when imposing a sentence. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see* 18 U.S.C. § 3553(a).

A district court treats the Guidelines as only the "starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 39 (2007). The Guidelines reflect a "rough approximation of sentences that ***might*** achieve section 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007) (emphasis added). The sentencing court may conclude that "…the case at hand falls outside the 'heartland'…" *Id.* at 351. Moreover, **the sentencing court has *discretion* to impose a *non*-Guidelines sentence** "…because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless…" *Id.*

Sentencing courts enjoy the discretion to "…vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough, supra,* 552 U.S. at 101 (internal citations omitted). **The district court must make an *individualized* assessment when determining a sentence**. *Gall, supra,* 552 U.S. at 39. In sentencing, the following must be considered: "…(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission

policy statements; (6) ***the need to avoid unwarranted disparities***; and (7) the need for restitution." *Rita, supra,* 551 U.S. at 338; *see also* 18 U.S.C. § 3553(a).

**A. Relevant Sentencing Considerations.**

There are numerous relevant mitigating factors that merit Ms. Carlis receiving a non-custodial sentence as discussed in further detail below.

**i. Ms. Carlis' Acceptance of Responsibility and Assistance with the Government's Investigation and Prosecution.**

Ms. Carlis timely notified the Government of her intention to plead guilty and has cooperated throughout these proceedings. Accordingly, the Government has agreed to recommend a three-level reduction under U.S.S.G. § 3E1.1. Plea Agreement ¶ 3(d); PSR ¶¶ 70, 71. Ms. Carlis also accepted responsibility prior to trial and entered a guilty plea.

As such, a **two**-level downward departure is required because Ms. Carlis "…clearly demonstrates acceptance of responsibility for his offense…" U.S.S.G. § 3E1.1(a). *See id.*

In addition, although Ms. Carlis' Total Offense Level now falls below 16 because of the November 1, 2026 Amendment, thereby technically disqualifying her from an additional one-level downward departure under U.S.S.G. § 3E11.1(b), she nevertheless qualifies for a one-level downward departure as a discretional variance under 18 U.S.C. § 3553 (a) based on her early guilty plea, cooperation, and conservation of judicial resources. Ms. Carlis qualifies for this downward departure because the offense level was greater than level 16 at the time of her guilty plea; she timely notified the Government of her intention to enter a guilty plea; permitted the Government to avoid preparing for trial; and permitted the Government to allocate resources efficiently. *See id.*

Because of Ms. Carlis' acceptance of responsibility and willingness to enter a guilty plea, a sentence of 12 months' home confinement is appropriate. This sentence would be fair considering all the circumstances and would properly punish Ms. Carlis for her conduct.

**ii. Ms. Carlis' Family Obligations.**

Ms. Carlis is the sole source of financial support for her youngest son, Andrew (age 22), who is incapable of working because of his ongoing, lifelong severe mental health problems. If she were sentenced to actual imprisonment, she would be unable to continue doing so. She would also lose her home to foreclosure, which would result in him being

rendered homeless. The severity of Andrew's pathologies is evidenced by an August 20, 2022 medical report from Dana Gilbert Schwarz, M.D.: "Andrew Carlis … presents to the emergency department…. Patient reportedly took 30 tablets of gabapentin … in an attempt to harm himself. … Per mother, pt stabbed his brother with a knife … recently…. Past Medical History: … Major Depressive Disorder…." **Defense Exhibit G**.

**iii. Ms. Carlis' Dedication to Public Service.**

Ms. Carlis has devoted most of her professional life to social work and public service, including through her own private business, particularly in assisting the underprivileged and underrepresented. See, e.g., the July 23, 2025 letter from her former professional colleague, Forensic Clinical Psychologist Hanna Jones, Psy.D.: "I have worked with Ms. Carlis for … over 6 months and she is the epitome of professionalism. Ms. Carlis is someone who will help others before helping herself and would gladly go out of her way to educate someone or train someone when needed. **She single-handedly runs a caseload of 80+ <u>parolees</u>** and runs her own business with an even larger caseload. … Ms. Carlis has an unmatched talent for being able to develop and maintain rapport with difficult clients…. She is supportive of clients and co-workers…. Ms. Carlis helped train me at Therapy Associates of Solano County…. She would be a benefit and asset to anyone who has the opportunity to work with her." **Defense Exhibit H**.

See also the February 27, 2025, letter from another professional associate, Chuck Bell:

> I have had the privilege of knowing Shukimba for 15 years in both a personal and professional capacity, and I can confidently say that she is one of the most reliable and hardworking individuals I have encountered. Shukimba possesses a rare combination of professionalism, compassion, and an unwavering commitment to excellence. … Beyond her professional skills, Shukimba is a person of strong moral values. She is honest, trustworthy, and deeply committed to helping those around her. Whether through mentorship, **community involvement**, or simply lending a helping hand, she consistently demonstrates kindness and selflessness.

**Defense Exhibit I**.

See also the March 25,2025, letter from a third professional associate and "close friend of Shukimba Carlis for 7 years", Ms. Chantal Miller:

> At **the state hospital**, I quickly noticed how devoted Shukimba was to helping our patients…. From 9am to 4pm, Shukimba was rarely seen in her office even though we worked together on a co-ed **geriatric unit**. She was busy providing … like individual therapy and group dialectical behavior therapy. She would often stay at work past 7pm…. Together we started a **sex offender treatment program**, … Open Arms Therapeutic Services. … Shukimba … act[ed] as treatment director [and] primary clinician…. From working on the same treatment team at Napa State Hospital to … the sex offender treatment program, I still admire her integrity and dedication in her work. I know Shukimba's character to be authentically consistent and compassionate.

**Defense Exhibit J**.

### iv. The Probation Office's Recommendation that Ms. Carlis' Professional License Be Permanently Surrendered is Unnecessary and Unjust because It Had No Connection to the Charged Offense.

The June 11, 2026 Sentencing Recommendation includes the following recommended condition (no. 7): "The defendant shall not be employed in any position that requires licensing or certification by any local, state, or federal agency without the prior written approval of the Probation Officer." *Id*., p. 3.

This condition – which was not included in the Plea Agreement – greatly concerns Ms. Carlis because it directly affects her livelihood as a licensed clinical social worker, as well as her other professional certifications. And because her clinical work is not related to the charged conduct in this case, it would be inequitable to prevent her from maintaining her license.

U.S.S.G. § 5F1.5 ("Occupational Restrictions") states:

> (a) The court may impose a condition of probation or supervised release prohibiting the defendant from engaging in a specified occupation, business, or profession, or limiting the terms on which the defendant may do so, ***only*** **if it determines that**:
>
> (1) **a reasonably *direct* relationship** existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction; and
>
> (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted.

> (b) If the court decides to impose a condition of probation or supervised release restricting a defendant's engagement in a specified occupation, business, or profession, the court ***shall* impose the condition for the minimum time and to the minimum extent necessary** to protect the public.

*Id*. (emphasis added).

Here, the Government has never asserted that her license had any connection whatsoever – direct or indirect – to the charged conduct. In addition, even with a felony conviction, she may still be able to retain her license and certifications. Therefore, she does not want this condition to interfere with her ability to continue practicing in her profession, earning income, and thereby satisfying her restitution while also continuing to financially support her son Andrew. Accordingly, Ms. Carlis respectfully requests that the Court not impose this condition at sentencing.

**v. The Probation Office's Recommendation that Ms. Carlis Submit to Drug Testing is Unnecessary and Unjust.**

The June 11, 2026 Sentencing Recommendation includes the following recommended condition (no. 4): "The defendant shall refrain from any unlawful use of a controlled substance [and] … submit to one drug test within 15 days of release from custody and at least two periodic drug tests thereafter, not to exceed eight tests per month…." *Id*. at p. 3 of 11.

As with Ms. Carlis' professional license, drug use had nothing to do with the charges against her; nor was it included in the Plea Agreement. This condition appears to have been included by the Probation Officer based on her mistaken belief that Ms. Carlis had previously avoided a criminal conviction by completing state Drug Court: "***[C]ollateral*** sources ***indicate*** a successful completion of Drug Court in 2022." *Id*. at p. 7.

First, the Solano County Superior Court records pertaining to this incident were sealed and, therefore, the Government could not possibly have found any actual evidence that she had participated in Drug Court. Nor could they have because drugs had nothing whatsoever to do with that issue. Merely claiming there was an "indication" of such, by definition, evidences the lack of any proof relating thereto.

Second, Ms. Carlis resolved that legal issue by successfully completing 80 hours of community service; specifically, by volunteering for Habitat for Humanity. **Defense Exhibit K**. Thus, she never participated in Drug Court.

Nor has she ever used any illegal street drugs, and has only rarely used marijuana, with the last time being 18 months ago in May 2025. Therefore, while the Sentencing Recommendation was technically correct that "Carlis reported a history of marijuana use" (*id*. at p. 7), this does not justify the burden and expense of her having to submit to and pay for drug tests during her agreed-upon 3 years of supervised release. And even when she did intermittently and infrequently use marijuana in the past, it was always and only for the purpose of helping with her anxiety and sleep deprivation (which she since has treated with prescribed medication and therefore no longer needs or desires marijuana).

Accordingly, Ms. Carlis respectfully requests that the Court also not impose this condition at sentencing.

**vi. The November 1, 2026 Amendment Supports a Downward Departure.**

On November 1, 2026, the Sentencing Commission's amendment of the Guidelines under 18 U.S.C. § 3553(a) went into effect. The amendment raises the monetary thresholds in the § 2B1.1 ("Larceny, Embezzlement, and Other Forms of Theft; … Fraud and Deceit") loss table to account for inflation. 91 *Fed. Reg*. 24088 (May 4, 2026). The new loss table is as follows:

| **Loss (apply the greatest)** | **Increase in Level** |
|---|---|
| (A) $9,000 or less | no increase |
| (B) More than $9,000 | add **2** |
| (C) More than $20,000 | add **4** |
| (D) More than $55,000 | add **6** |
| (E) More than $150,000 | add **8** |
| (F) More than $200,000 | add **10** |
| (G) More than $350,000 | add **12** |

Therefore, the loss asserted by the Government would produce a 10-level, rather than 10-level, enhancement. The Government's proposed Total Offense Level would

therefore be calculated as follows:

Base Offense Level of 7, plus a 10-level increase based on an "actual" loss of $272,481.91, plus a 2-level increase for abusing a position of trust = 19; then a downward departure of 3 for accepting responsibility and assisting in her own prosecution, plus a downward departure of 2 for being a Zero-Point Offender, for a Total Offense Level of **14**. This results in an advisory range of 15 to 21 months for a defendant such as Ms. Carlis who is in Criminal History Category I.

**vii. Factors Supporting a Downward Departure and Calculation Thereof.**

Aside from the single footnote in the PSR (¶ 21, fn. 3) and the single footnote in its Supplemental Sentencing Position regarding Ms. Herrera (3:23-28, fn. 2), the Government makes no further mention of their claim that Ms. Carlis and Ms. Herrera used the two credit cards interchangeably, and provides no substantial evidence that they, in fact, actually did so. (Nor is there any assertion in the PSR that Ms. Carlis used Ms. *Herrera's* credit card at Louis Vuitton in Beverly Hills – see below.) This is critical because based on these two footnotes, the Government seeks to place the entire loss on *each* of them, which is unwarranted. This argument is supported by the fact that they are not being charged with Conspiracy (18 U.S.C. § 1349) and are otherwise not alleged to have *conspired* with each other. See, for example:

> While Carlis held a higher position within the organization, Herrera appears to have benefited more based upon the accumulation of more non-AFSCME-related expenses on her AFSCME credit card. [¶ 60] The Probation Officer does not have information to indicate that either Carlis or Herrera was the organizer, leader, manager, or supervisor of the other. Further, there is a lack of information to indicate that either Carlis or Herrera is substantially less culpable than the other. **As such, Carlis is viewed as an average participant in the criminal activity, and no role adjustment is applied**.

PSR ¶¶ 59, 60 (emphasis added).

Conversely, the evidence instead reveals the following: out of $272,481.91 combined spending across 926 items, Ms. Herrera generated more than four-fifths of the subject charges – specifically, **82.64%** ($225,189.67) across 771 transactions -- and Ms. Carlis generated less than one-fifth thereof; specifically, only **17.36%** ($47,292.24) across 155 transactions. Therefore, it is unfair and simply inaccurate to attribute more than

$47,292.24 of the total loss to Ms. Carlis for purposes of sentencing.

Retail store purchases represent 79.06% ($215,429.47) of total spending across both cards ($181,057.18 for Ms. Herrera and $34,372.29 for Ms. Carlis). The larger retail expenses were incurred exclusively by Ms. Herrera for her sole personal benefit, with no indication or record that any of these retail purchases were shared.

The evidence also shows that Ms. Herrera alone relied extensively on installment-payment tools like Afterpay and Quadpay (now called Zip) for her purchases while Ms. Carlis did not, thereby further implicating Ms. Herrera alone in her frequent high-end retail purchases.[5]

In addition, the vast majority of Ms. Herrera's total expenditures constitute high-frequency personal retail purchases benefiting her alone, thereby casting further doubt on the Government's assertion that the defendants used the credit cards interchangeably. So, too, does the fact that purchases were sometimes made on the same day on both cards with the same store, thereby clearly indicating that each person paid for their own items. In other words, there was no *need* for defendants to use the credit cards interchangeably.

In any event, to dramatically increase the Total Offense Level for each defendant, the Government asserts they used the cards interchangeably, which, by definition, implies that they conspired with each other. However, the Government has insufficient evidence to prove beyond a reasonable doubt the elements of Conspiracy (to Commit Wire Fraud) under 18 U.S.C. § 1349: (1) that two or more persons agreed to commit wire fraud; and (2) that the defendant knowingly and willfully joined that agreement with the intent to further its unlawful purpose.

Here, the Government's assertion that Ms. Carlis and Ms. Herrera used the cards interchangeably – and thereby conspired with each other to commit wire fraud – is essentially based on two receipts (March 30 & 31, 2022) from the Louis Vuitton retail boutique in Beverly Hills that identify three transactions: the first two on Ms. Herrera's card on March 30th and the third the following day on Ms. Carlis' card:

///

[5] More specifically, Ms. Herrera frequently utilized Buy-Now-Pay-Later (BNPL) micro-installments, logging 101 separate transactions for Afterpay and 9 transactions for Quadpay/Zip.co, thereby revealing heavily distributed retail purchasing habits.

| Location | Date and Time | Carlis - 8607 | Herrera - 8979 |
|---|---|---|---|
| Store 3125. Register 15 | date: 03/30/22; 5:47 | - | $5,579.03 |
| Store 3125. Register 15 | date: 03/30/22; 5:50 | - | $569.40 |
| Store 3125. Register 7 | date: 03/31/22; 4:34 | $2,452.80 | |

For some reason (which even the Government has never proffered), although Ms. Herra purchased the items totaling $5,579.03 and $569.40 on March 30, 2022, the two receipts identify "Client: Shukimba Carlis", which, again, the Government relies upon to assert that it was actually Ms. *Carlis* who was using Ms. *Herrera's* card and, therefore, because they allegedly did so on this single date, *each* should be punished for the entire $272,481.91.

However, the Government has no evidence as to whether this actually occurred. In fact, the more likely scenario was that Ms. Herrera used her own card to make these purchases, and the salesclerk identified Ms. Carlis as the "client" because Ms. Carlis had previously shopped there and, therefore, had an "account" (i.e., Louis Vuitton had stored her name, contact information, and purchase history to track her purchases, which virtually all luxury-goods boutiques do for marketing purposes and to offer benefits to their repeat customers).

In other words, the salesclerk likely inputted Ms. Carlis' name entirely on her own and without Ms. Herrera claiming she herself was Ms. Carlis. Alternatively, perhaps Ms. Herrera mentioned Ms. Carlis' name to receive a discount on the purchases because of the latter's "account" there. The bottom line is that determining exactly what occurred on that day is pure speculation. In other words, the Government seeks to greatly increase the defendants' Total Offense Levels based on this unsupported speculation. It is axiomatic that for the Government to properly seek an upward departure based on uncharged underlying offenses, they must have *some* evidence. Here, they do not.

For example, there is no evidence in the form of emails, text messages, recordings, videos, or anything else proving that the defendants knowingly and willfully entered an actual *agreement* to use the cards illegally, much less interchangeably, to commit wire fraud. Therefore, Ms. Carlis respectfully requests that the Court reject the Government's

assertion which, in Ms. Carlis' case, was made solely to elevate her Total Offense Level by 10.

"Herrera acknowledged she and defendant used the credit cards interchangeably when shown evidence that her AFSCME Credit Card ending in -8979 was used by defendant, *inter alia*, on or about March 30, 2022, to purchase approximately $5,579 in luxury goods from Louis Vuitton in Beverly Hills. Government's Supplemental Sentencing Position regarding Ms. Herrera, Dkt. no. 58, 3:26-28, fn. 2. As discussed above, this was a false self-serving statement that she made to assign equal blame to Ms. Carlis instead of admitting that she personally made almost 83% of the subject charges (mostly on clothing that only she benefitted from).

**1. The overstated loss amount warrants a variance independent of any Guideline re-calculation.**

The total loss asserted by the Government is $272,481.91; however, even the Government admits that only $47,292.24 (17.36%) is directly attributable to Ms. Carlis via purchases made on her own union credit card. Again, the Government wants an upward departure of 10 levels based on the speculative assertion that the defendants interchangeably used their cards and therefore both are responsible for 100% of the asserted $272,481.91 loss: "[T]he total loss was caused by defendant and co-defendant Carlis' jointly undertaken criminal activity…." *See* Dkt. no. 49 (Government's Sentencing Position regarding Ms. Herrera), 5:9-10. However, there is no allegation that the defendants shared any of the purchased items or otherwise "jointly" purchased them.

If the Court agrees with Ms. Carlis' position, then under the amended Guidelines, instead of a 10 level upward departure, her Base Offense Level increases by only 4 because the loss directly attributed to her is more than $20,000 but less than $55,000. If the Court agrees, then Ms. Carlis' Total Offense Level would be calculated as follows:

**<u>Base Offense Level of 7, plus a 4-level increase based on an "actual" loss of less than $55,000, plus a 2-level increase for abusing a position of trust = 13; then a downward departure of 3 for accepting responsibility and assisting in her own prosecution, plus a downward departure of 2 for being a Zero-Point Offender, for a Total Offense Level of 8, which, with Criminal History Category I, would place her in a custodial sentence range of 0 to 6 months (Zone A).</u>**

**2. Ms. Carlis poses no danger to the community and has no criminal history**.

Ms. Carlis' lack of a significant criminal history qualifies her as a zero-point offender under U.S.S.G. § 4C1.1. PSR ¶¶ 80, 137. Since her arrest, she has fully complied with the terms of her pre-trial supervision. PSR ¶¶ 14-15. Therefore, it cannot be reasonably disputed that she does not pose any danger to the community or any risk of recidivism.

**B. The Circumstances of the Offense Call for a Non-Custodial Sentence.**

When analyzing the type of sentence to impose, the district court must consider "…the nature and circumstances of the offense, and the history and characteristics of the defendant…." 18 U.S.C. § 3553(a)(1). The nature and circumstances weigh in favor of a non-custodial sentence. *See id.* Ms. Carlis acknowledges that she engaged in criminal conduct and that she is guilty. However, there are numerous issues that mitigate her behavior. Although these facts do not absolve Ms. Carlis of her conduct, they demonstrate that the proposed sentence of 12 months' home confinement is appropriate.

Ms. Carlis is deeply and sincerely remorseful, embarrassed, and humiliated for having engaged in wire fraud. She understands the damage she inflicted on her fellow union members and the significant amount of harm this crime cause to the public. She has learned her lesson and is determined to have no further contact with the criminal justice system. As she contemplates her future, she wants to be a positive role model for her children, focus on her family (particularly her son Andrew), continue working hard and honestly, and timely repay 100% of all ordered restitution. She merely wants to resume a quiet life free from law enforcement contact.

Finally, the possible permanent loss of her professional license provides additional meaningful deterrence without the need for a custodial sentence.

**C. The Proposed Sentence Will Properly Address the Sentencing Needs.**

When analyzing the need for the sentence imposed, the district court must consider various factors, including the necessity "…to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense…" 18 U.S.C. § 3553(a)(2)(A). A sentence should also provide "…adequate deterrence to criminal conduct" and "…protect the public from further crimes of the defendant…" 18 U.S.C. §§ 3553(a)(2)(B), (C).

///

**i. The Proposed Sentence Reflects the Seriousness of the Case.**

As discussed above, the proposed non-custodial sentence properly reflects the seriousness of this case, as well as Ms. Carlis' exemplary conduct since this case was filed 20 months ago.

**ii. The Proposed Sentence Provides Adequate Deterrence.**

The need for the sentence imposed encompasses both "specific deterrence" of the particular defendant as well as "general deterrence" of other offenders who might pay attention to the sentence imposed for this case. As for specific deterrence, the 12 months of home detention, followed by 3 years of supervised release, plus the substantial restitution order will deter Ms. Carlis from ever committing criminal conduct in the future. Indeed, Ms. Carlis has been dealing with these allegations for a significant period of time, and her life has irrevocably changed as a result. The recommended sentence is more than sufficient to deter Ms. Carlis from re-offending.

As for general deterrence, the proposed sentence is a sufficient sentence to deter similar offenders. Ms. Carlis' life has been significantly restricted and now she faces potential imprisonment in federal custody. But whether completing her sentence in prison or at home, her freedom will be severely curtailed, and she will be unable to resume her everyday life for years. In addition, she has been consistently shamed in public for more than four years via numerous articles about her and this case in the *Sacramento Bee* (on August 2, 2022; October 24, 2022; June 6, 2025; and April 10, 2026).

Accordingly, the recommended term of 12 months' home confinement, 3 years' probation, and restitution serve as both a general deterrent to others and a specific deterrent to Ms. Carlis. *See* 18 U.S.C. §§ 3553 (a)(2)(B). In fact, Ms. Carlis wishes to never be involved in the criminal justice system again and wants to re-start her productive life as soon as practically possible.

**iv. The Proposed Sentence Adequately Protects the Public.**

The proposed sentence will remove Ms. Carlis from society for 12 months. This is no more than necessary to protect the public from her and shield the public from her criminal behavior. Actual custody time is therefore unnecessary because she has had no violations while out of custody on pre-trial release and has otherwise behaved in an exemplary manner. She has shown she is a changed person and, therefore, a 12-month

home confinement sentence is therefore sufficient to protect the public.

**IX.**

**CONCLUSION**

Based on the foregoing, Ms. Carlis respectfully requests that the Court impose the proposed sentence of 12 months' home confinement, 3 years of probation, and restitution.

Dated: November 6, 2026

Respectfully submitted,

**SAFFARI LAW GROUP, P.C.**

Ninaz Saffari, Esq.
Attorneys for Defendant
SHUKIMBA MALIK CARLIS

///

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on November 6, 2026, I electronically filed the foregoing, with the Clerk of the Court, by using the CM/ECF system, and sent a copy via email to the following:

THI HOANG HO, AUSA
U.S. Attorney's Office
312 N. Spring Street
Los Angeles, CA 90012
Thi.Ho@usdoj.gov.

Dated: November 6, 2026

Respectfully submitted,

**SAFFARI LAW GROUP, P.C.**

Ninaz Saffari, Esq.
Attorneys for Defendant
SHUKIMBA MALIK CARLIS

///

## INDEX OF EXHIBITS

In support of this Sentencing Memorandum, Ms. Carlis submits the following exhibits, attached hereto:

**Defense Exhibit A**: Forensic Accounting Transaction Summary

**Defense Exhibit B**: Schedule JSH A1, Union Related Transactions (Combined)

**Defense Exhibit C**: Schedule JSH A2, Possibly Union Related Transactions (Combined)

**Defense Exhibit D**: Schedule JSH A3, Non-Union/Personal Transactions

**Defense Exhibit E:** November 15, 2022 letter from Ms. Carlis' former attorney, Russell J. Cole, to the Union

**Defense Exhibit F**: September 26, 2026 "Personal Statement of Acceptance, Reflection, and Remorse" from Ms. Carlis

**Defense Exhibit G:** August 20, 2022 medical report from Dana Gilbert Schwarz, M.D.

**Defense Exhibit H:** July 23, 2025 letter from Ms. Carlis' former professional colleague, Forensic Clinical Psychologist Hanna Jones, Psy.D.

**Defense Exhibit I:** February 27, 2025, letter from Ms. Carlis' professional associate, Chuck Bell

**Defense Exhibit J**: March 25,2025, letter from Ms. Carlis' professional associate and close friend, Ms. Chantal Miller

**Defense Exhibit K:** November 25, 2022 proof of Ms. Carlis' successful completion of Habitat for Humanity